(73 South. 845)

No. 20734.

COTHERN v. JULIA LUMBER CO.

(Jan. 15, 1917.)

*(Syllabus by the Court.)*

DAMAGES ⬅124(1)—CONTRACTS—PREVENTING PERFORMANCE—DAMAGES.

Where one of the parties to a contract is prevented by the other, without just cause, from executing the same, he is entitled to recover an amount equivalent to the profit of which he has been deprived and such other damages as he may show that he has sustained.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 326–329, 336; Dec. Dig. ⬅ 124(1).]

Appeal from Twenty-Sixth Judicial District Court, Parish of Washington; Joseph B. Lancaster, Judge.

Action by J. E. Cothern against the Julia Lumber Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Ponder, Gayer & Ponder, of Franklinton, for appellant. Ott, Johnson & Ott, of Bogalusa, for appellee.

MONROE, C. J. The defendant, the Julia Lumber Company (which is a commercial firm composed of J. W. Green and C. C. Arnett) prosecutes this appeal from a judgment condemning it to pay plaintiff $448.50, as 'damages for violation of a certain contract, but, save for the filing of the transcript, it seems to have put in no appearance in this court. Plaintiff has filed an answer to the appeal praying that the amount of the award be increased.

Plaintiff is engaged in the business of burning and selling charcoal. Defendant was engaged in sawing and selling lumber and cross-ties. The contract sued on reads as follows:

"This contract made and entered into this 6th day of May, 1913, between Julia Lumber Company, Julia, La., and J. E. Cothern, Julia, La., to wit:

"Julia Lumber Company contracts to J. E. Cothern all coaling timber which is left on ground after timber is removed and cross-tie timber is removed.

"J. E. Cothern contracts to remove all coaling timber from lands of Julia Lumber Company, as specified above; he to clean up by 40's, said 40's to be specified by Julia Lumber Company, and to pay Julia Lumber Company, as each car of coal is shipped, at the rate of seven dollars and fifty cents ($7.50) per car.

"Witness our signatures in duplicate the 6th day of May, 1913, A. D.

"[Signed]     Julia Lumber Co.,
"By C. C. Arnett.
"J. E. Cothern.

"Witness: E. A. Hammer."

On the day following the signing as above plaintiff entered into a contract reading as follows:

"New Orleans May 7, 1913.

"Agreement between Bautovich & Netto, of New Orleans, and J. E. Cothern of Julia, La.

"Bautovich & Netto agrees to buy all coal made by J. E. Cothern of Julia, La., at $130.00 per car, for one year ending May 7, 1914; cars to measure 36 foot in length, 8 foot high, 8—6 width, and fully loaded with clean, dry coal, other cars in proportion. J. E. Cothern agrees to sell Bautovich & Netto all c/ coal made by

him, as above stated, for one year ending May 7, 1914.     [Signed]     Bautovich & Netto.
                    ".J. E. Cothern."

Shortly after the contracts were entered into, defendant, through one or the other of its members, designated a particular tract of land, being that in the vicinity of its mill and commission, and instructed plaintiff to clean it up, and he began and proceeded with the work of cutting the material that he found there and otherwise preparing to convert it into charcoal.    On June 6th Mr. Arnett stopped the work, alleging that plaintiff's men were cutting timber that was available for lumber and cross-ties, and, after a violent altercation, ordered plaintiff off the premises, and plaintiff thereafter cut no more of the timber, but remained on the land until he burned and shipped that which he had already cut, amounting to two carloads, for which he received the price called for by his contract with Bautovich & Netto.

There appears to have been a difference of opinion between plaintiff and Arnett as to the meaning of the contract sued on, plaintiff construing it to mean that defendant was to remove all timber considered suitable for its purposes from a particular 40-acre tract and then turn the tract over to him to be cleaned of all that was left, the idea being that the residue in such case should be converted into charcoal, whilst Arnett's interpretation seems to have been that defendant was to remove such of the merchantable timber as it thought proper, and then turn the tract over to plaintiff, subject to the condition that he should take only such material as might be suitable for no other use than conversion into charcoal.    It is, however, conceded on both sides that the contract did not include green standing timber as material for charcoal.    There was some conflict in the testimony upon the question whether any appreciable amount of timber, suitable for defendant's purposes, was left on the tract that was turned over to plaintiff,

though it is admitted that there were some green sapling, and that a few of them, say, half a dozen, were cut by plaintiff's men, but it is shown that he stopped such cutting when his attention was called to it, and the trouble does not appear to have arisen from that source.    Our consideration of the testimony thus referred to leads us to the conclusion that there was, at best, but little timber on the tract in question from which either merchantable lumber or cross-ties could have been manufactured, which circumstance confirms us in the view that the interpretation placed upon the contract by plaintiff was the one intended by the parties, and that the right and obligation of plaintiff (as derived from the contract) was to "clean up" each "40," as the same should be designated by defendant, by removing all "down" material that he should find.    Whether there was also included standing dead timber is not altogether clear, but that is not an issue in the case;    the controversy with Arnett having arisen over a few pieces that were lying on the ground.

The land controlled by defendant for the purposes of its operations when the contract in question was entered into was known as the "Miller property," which is said to consist of two sections.    Plaintiff alleges that other lands were also within the contemplation of the contract, but the evidence does not sustain that allegation.    This suit was instituted on July 3 and the answer was filed on December 1, 1913.    In the meanwhile, on July 9th, Arnett had sold his interest in the defendant firm and retired.

It is alleged in the answer and reiterated by Mr. Green, the remaining partner, in his testimony, that plaintiff was not ordered to discontinue work under his contract, and that defendant would be glad even now to have him go on with it; but we conclude that the invitation to that effect was given by way of an attempt to compromise, after the insti-

tution of the suit and after defendant had scattered his working force and found employment elsewhere. Plaintiff in his petition claims $12,000, as follows:

"Petitioner avers that he made a net profit, clear of all expenses and charges, on the car of coal shipped, of $40; that he has made a careful and conservative estimate of the coaling timber on the 40-acre tract from which said timber was cut, and that it would have yielded petitioner, at the least calculation, 15 cars; that, in addition to the 40-acre tract, petitioner's contract covered the entire tract of land known as 'Miller property' and other property adjacent thereto, the exact acreage of which is unknown to petitioner, but that there were at least twenty 40-acre tracts, each of which would yield a cut of 15 cars of coal, making a total of 300 cars of coal, on which basis said contract would have yielded petitioner a net profit of $12,000."

In the course of his testimony plaintiff said:

"This carload of coal that I shipped out cost me about $87 and a few cents, which left $42 and something."

The judge a quo found that two cars had been shipped at a profit of $34.50 per car, as, in his opinion, plaintiff had not included in the $87 of expense, the $7.50 that he was to pay defendant, and he reaches the $448.60 for which he gave judgment as follows (quoting from his opinion):

"As plaintiff states that he could not have delivered more than 36 cars of charcoal per year, and as the evidence also shows that the 40-acre tracts herein would produce 15 or 16 carloads of charcoal each, etc., he could not have cut and cleaned up more than two 40-acre tracts and a quarter of another during the year in which his contract with Bautovich & Netto existed, which would have amounted to not more than 36 carloads of charcoal. But, in view of the additional fact that the defendant had the exclusive right to designate and point out to the plaintiff these 40-acre tracts and to say when plaintiff should enter upon them, it is proper to confine the amount of damages due to plaintiff to the particular 40-acre tract that the defendant did designate and point out, and upon which the plaintiff did begin operations for the making of charcoal. As shown above, the plaintiff made a profit of $34.50 per car of charcoal shipped by him, and, as this particular 40-acre tract would have produced 15 cars of charcoal, it would amount to the sum of $517.50.

"But the evidence shows that plaintiff received payment for two carloads of charcoal, namely, the sum of $69 [meaning that he realized that profit], which, deducted from the total amount of $517.50, leaves a balance due of $448.50, which sum is the amount of damages, in my opinion, that plaintiff is to recover."

In his application for an amendment of the judgment plaintiff prays:

That the amount allowed be increased "to an amount which this * * * court may determine to be commensurate with the damages sustained."

In the brief filed in his behalf his learned counsel acquiesce in the calculation of profit per car as made by the trial judge, but think that he has erred in confining the award to the profit that would have been earned on the particular 40 upon which plaintiff was at work. They say:

"The evidence shows that plaintiff was producing coal at the rate of at least two standard cars per month. He had his market at a fixed price for 12 months, and, no doubt, would have produced and marketed 24 cars during that time."

Answering the objection (found in the opinion of the trial judge) that defendant might have failed, or declined, to designate any other 40 for plaintiff to work on, the counsel say:

"Declining to designate other tracts, in accordance with the contract, would have been as flagrant a breach of the contract as defendant could have made. At the time the contract was entered into, and on the day of the breach thereof by defendant, the Julia Lumber Company had several 40-acre tracts upon which all timber had been cut and removed by them and which they could have pointed out to plaintiff as being ready for coaling."

On a preceding page of the same brief it is said:

"The contract even goes so far as to leave it entirely to the discretion and judgment of the defendant company as to what tracts of land were ready to be coaled. Had it been left to the judgment of plaintiff when to enter upon a tract of land to cut and burn coal under this contract, the defendant's position [that it was left to the discretion of plaintiff to determine what material on a designated tract he should appropriate to coal] might have been more reasonable, but the contrary is true. The plaintiff had no discretion as to what tracts he should clean up by burning coal thereon; he was dependent entirely upon the tracts being specified by the Julia Lumber Company."

140 LA.—24

'Conceding, however (and we incline to that view), that defendant could not, arbitrarily and in bad faith, have declined to designate a tract which was really in readiness for coaling, the burden rests on plaintiff to show that state of facts, and we do not find that he has done so. If the record contains any such evidence, it has escaped our rather careful investigation, and, though the counsel mention "several 40-acre tracts" which they say might have been pointed out, they do not point out to us where they obtained that information. Upon the whole we find no reason for making any change in the judgment appealed from, which is therefore

Affirmed.